UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MICHAEL SOMMERKAMP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:24-cv-00993-SEB-CSW |
| | ) | |
| HORIZON BANK, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Now before the Court is Defendant's Motion for Summary Judgment [Dkt. 35]. Plaintiff Michael Sommerkamp has brought this action against his former employer, Defendant Horizon Bank ("Horizon"), alleging that Horizon violated his rights under the Family Medical Leave Act of 1993 ("FMLA"). For the reasons detailed below, we <u>GRANT</u> Defendant's Motion for Summary Judgment.

## **Factual Background**

Mr. Sommerkamp began his employment with Horizon on June 21, 2021. Dkt. 35-1 at 193; Exh. 22 to Dkt. 35-1. At all times during his employment, Mr. Sommerkamp held the position of Senior Personal Trust Officer. Sommerkamp Dep. at 50. Prior to joining Horizon, Mr. Sommerkamp was an attorney practicing estate planning and contract work out of his own firm. *Id.* at 43.

When Mr. Sommerkamp was hired, he signed an offer letter that explicitly provided that his employment with Horizon was at will and acknowledged that "as

1

an at-will employee [his] employment relationship may be terminated at any time with or without cause." *Id.* at 51; Exh. 3 to Sommerkamp Dep. at 2.  Throughout his employment, Mr. Sommerkamp had access to Horizon's employment handbook, which included Horizon's Progressive Discipline Policy (the "Policy"). Sommerkamp Dep. at 60.  The Policy provided that, in the event that an employee demonstrated behavior or performance issues, their supervisor should first verbally discuss the issue with them before escalating the discipline to a written warning or termination.  *Id*. at 61; Exh. 4 to Sommerkamp Dep. at 18.  The Policy further provided: "However, Horizon retains the right to administer discipline in any manner that it sees fit.  This policy does not modify the status of employment-at-will or in any way restrict Horizon's right to bypass the disciplinary procedures suggested."  *Id.*

In his role as a Senior Personal Trust Officer, Mr. Sommerkamp's duties included "managing fiduciary and investment-oriented client relationships in which the bank is acting as trustee, executor, administrator, conservator, guardian, depositor, or agent, and developing new personal trust business by providing Exceptional Service and Sensible Advice."  Snyder Decl. ¶ 5, Exh. A to Snyder Decl.  One of Mr. Sommerkamp's fundamental responsibilities was to "[d]evelop new business through referrals and centers of influence" by creating sales proposals to generate business."  *Id.*; Sommerkamp Dep. at 53.

2

At all times relevant to this litigation, Mr. Sommerkamp reported to Kathleen Snyder, Horizon's Investment Sales and Risk Compliance Manager. Sommerkamp Dep. at 15; Snyder Dep. at 7.  When Mr. Sommerkamp began his employment, he inherited a book of business that consisted of roughly forty trust accounts, IRA accounts, and investment management accounts.  Snyder Dep. at 11. A primary part of Mr. Sommerkamp's role was to continue developing business from his current book while also generating new business.  *Id.*  Prior to his employment with Horizon, Mr. Sommerkamp had experience as a financial advisor, but he did not have any prior experience managing trust accounts. Sommerkamp Dep. at 53.  So that he could focus on learning his accounts, Mr. Sommerkamp was not given a sales goal for the first six months of his employment with Horizon.  *Id.* at 75.

Ms. Snyder completed Mr. Sommerkamp's first performance review in December 2021, at which point he had been working for Horizon for approximately six months.  Snyder Decl. ¶ 7.  As discussed above, Mr. Sommerkamp at that point had not yet been assigned a sales goal and he was expected to focus on learning his current book of business, meeting with existing clients, visiting other Horizon branches, and becoming more comfortable managing accounts.  Snyder Decl. ¶ 8.  Mr. Sommerkamp received an overall "Meets Expectations" rating and was awarded a concomitant pay increase, but Ms.

3

Snyder advised in her comments that Mr. Sommerkamp "need[ed] to focus on learning all aspects of his accounts.  It is expected in 2022 that he will be more comfortable with the role of trustee and the various internal systems and procedures."  Snyder Decl. ¶ 7; Exh. B to Snyder Decl.

Ms. Snyder first gave Mr. Sommerkamp a sales goal in January 2022, initially in an amount less than his peers.  Sommerkamp Dep. at 76.  However, shortly thereafter, without explanation, his sales goal doubled.  According to Mr. Sommerkamp, it was his understanding that the increased sales goal was to help make up certain losses Horizon sustained in its Employee Stock Ownership Plan ("ESOP") product line.  *Id.*  At that same time, Mr. Sommerkamp learned that Horizon was not going to provide him with the administrative assistance he was told he would have, which meant that he was required to spend more time than he anticipated handling administrative tasks, leaving him less time to perform his actual job duties.  Sommerkamp Aff. ¶ 4.  As a result, Mr. Sommerkamp's job performance, particularly with regard to visiting bank branches, sending letters to business influencers, managing client and support staff expectations, and general accuracy, suffered in January and February 2022.  *Id.* ¶ 5.

On January 19, 2022, a few weeks after his review, Ms. Snyder met with Mr. Sommerkamp to discuss the fact that he had failed to visit any other Horizon branch in the fall of 2021, despite her having directed him to do so.  Snyder Decl.

¶ 11; Exh. C to Snyder Decl.  Ms. Snyder also discussed with Mr. Sommerkamp a client's complaint about his failure to follow up regarding a financial plan the client had requested.  Exh. C to Snyder Decl.  In response, Mr. Sommerkamp blamed Horizon's financial planner for the failure to respond, even though Mr. Sommerkamp was responsible for maintaining the client relationship.  *Id.*; Sommerkamp Dep. at 86.

Two days later, on January 21, 2022, Ms. Snyder had another discussion with Mr. Sommerkamp about his performance, this time regarding the importance of responding to client emails.  Sommerkamp Dep. at 105-106; Exh. 6 to Sommerkamp Dep.  This discussion was prompted by Mr. Sommerkamp's failure to respond to an email that resulted in two invoices not being properly paid for a client.  Exh. 6 to Sommerkamp Dep.

Four days after that, on January 25, 2022, Ms. Snyder had yet another discussion with Mr. Sommerkamp about his performance after he had incorrectly used the book value of an account rather than the market value to determine the amount to be paid to a beneficiary.  *Id.*; Sommerkamp Dep. at 106.  The mistake was caught by a Horizon assistant who was responsible for over 1,000 clients.  Sommerkamp Dep. at 106-07.  When Ms. Snyder discussed the error with Mr. Sommerkamp, she coached him about the need to pay more attention to detail in performing his work.  Exh. 6 to Sommerkamp Dep.

On February 16, 2022, Ms. Snyder again spoke with Mr. Sommerkamp after he failed to credit an account, causing it to become delinquent. *Id.* Following the incident, Mr. Sommerkamp had contacted a broker who was not associated with the account and provided confidential information, including the account number and name. *Id.* Ms. Snyder informed Mr. Sommerkamp that, in sharing such information, he had committed a privacy violation. Sommerkamp Dep. at 110.

The next day, on February 17, 2022, Ms. Snyder had her fifth performance-related discussion with Mr. Sommerkamp in less than one month. Ms. Snyder reiterated during this discussion the need for Mr. Sommerkamp to provide exceptional client service, including by ensuring that his work was accurate, timely, and error-free. Exh. 6 to Sommerkamp Dep.

One week later, on February 25, 2022, Ms. Sndyer issued Mr. Sommerkamp a written warning about the above-detailed performance issues that she had discussed with him. *Id.* Ms. Snyder met with Mr. Sommerkamp to discuss the written warning, which he signed. *Id.*; Sommerkamp Dep. at 112. At the time he received the written warning, Mr. Sommerkamp understood that failure to improve his performance would lead to further action, up to and including termination. Sommerkamp Dep. at 113. Indeed, by that point, Ms. Snyder had communicated to him on more than one occasion that his place at Horizon was not secure, a fact that Mr. Sommerkamp had acknowledged in a January 26, 2022 email exchange

6

with Ms. Snyder.  Sommerkamp Dep. at 88; Exh. 5 to Sommerkamp Dep. ("Kathy, I WANT to follow your guidance word-for-word, step-by-step, [but] I am afraid to—at least now when I feel my place at Horizon is less than secure.").  After he received the written warning, Mr. Sommerkamp worked hard to improve his performance, and did not receive any further warnings from Ms. Snyder for the next few months.

In early April 2022, Mr. Sommerkamp was involved in an automobile accident.  On Monday, April 4, 2022, at 8:47 a.m., Mr. Sommerkamp emailed Ms. Snyder to inform her that he had been rear-ended in his vehicle and would not be in the office that day, though he would be "checking email."  Sommerkamp Dep. at 130; Exh. 8 to Sommerkamp Dep.  That night, at 7:55 p.m., Mr. Sommerkamp texted Ms. Snyder a photo of himself in a hospital gown, PPE mask, and neck brace, informing her that he might not be at work the next day.  Sommerkamp Dep. at 130; Exh. 9 to Sommerkamp Dep.  Ultimately, Mr. Sommerkamp did not return to work for the rest of the week.  Sommerkamp Dep. at 133.  On Friday, April 8, 2022, Ms. Snyder sent Mr. Sommerkamp a text message asking how he was doing. Mr. Sommerkamp described his symptoms and the side effects of the medication he was taking and indicated that he would return to work on Monday, April 11, 2022.  Sommerkamp Aff. ¶ 11.

When Horizon's Human Resources learned that Mr. Sommerkamp had been absent due to a car accident, on April 25, 2022, Benefits Specialist Chris Walker contacted him by email and shared Horizon's FMLA documentation so that Mr. Sommerkamp could have his physician complete the required forms. Garwood Decl. ¶ 5; Exh. A to Garwood Decl. Mr. Walker followed up with Mr. Sommerkamp over two weeks later, informing him that the documentation was necessary because he had been out of the office for more than three days following his accident. *Id.*

Mr. Sommerkamp was initially resistant because he did not believe that he needed FMLA leave, but after Mr. Walker followed up several more times, Horizon received Mr. Sommerkamp's FMLA documentation from his physician. Sommerkamp Dep. at 139–140. On the certification form, Mr. Sommerkamp's physician noted that he would need physical therapy one to two times per week. *Id.* at 141. However, by the time Mr. Sommerkamp's physician submitted the documentation to Horizon, Mr. Sommerkamp had informed Horizon that he was not seeing a physical therapist. *Id.* at 147; Exh. 11 to Sommerkamp Dep.

On June 2, 2022, after receiving the documentation from Mr. Sommerkamp's physician, Horizon designated the period of April 4, 2022 through April 12, 2022 as FMLA leave for Mr. Sommerkamp's treatment following his car accident. Sommerkamp Dep. at 150; Exh. 14 to Sommerkamp Dep. At the time Horizon

8

granted Mr. Sommerkamp FMLA leave, he had not yet been employed by Horizon for one year and was therefore not statutorily eligible for FMLA leave. Sommerkamp Dep. at 194. Nonetheless, Horizon designated the entire period that Mr. Sommerkamp had been off work as FMLA leave. Exh. 14 to Sommerkamp Dep. Mr. Sommerkamp was freely permitted to attend all his follow-up appointments following his car accident and he did not request any additional FMLA leave for any other treatment. Sommerkamp Dep. at 150, 171–72.

At all times during the FMLA designation process, Mr. Sommerkamp worked directly with Human Resources. Garwood Decl. ¶ 11. Ms. Snyder did not have access to Mr. Sommerkamp's FMLA documentation, and she never discussed his FMLA leave with him. Snyder Dep. at 41.

After his car accident, Mr. Sommerkamp's work performance declined. According to Mr. Sommerkamp, he struggled due to his injury-related absences as well as various other distractions once he was able to return to work, including pain and discomfort and twice-weekly physical therapy appointments through the second week of May. Sommerkamp Aff. ¶ 17; Summerkamp Dep. at 139–40. As a result, Mr. Sommerkamp found that he could not keep up with the full-time demands of his position and fell behind the pace of his fellow full-time Senior Trust Officers. Sommerkamp Aff. ¶ 19.

Not long after Mr. Sommerkamp returned to work in April 2022, Ms. Snyder met with him to discuss his failure to properly complete two trust account reviews that he had been assigned. Snyder Decl. ¶ 17; Exh. D. to Snyder Decl. The following month, in May 2022, Ms. Snyder again had to remind Mr. Sommerkamp to complete the outstanding reports that he had failed to complete in April. Exh. D. to Snyder Decl. Ms. Snyder spoke with Mr. Sommerkamp on several other occasions throughout April and May, advising him that he needed to immediately do four things to improve his performance: (1) increase his sales efforts and document his calling efforts; (2) send letters to attorneys and follow up with them about potential business; (3) visit other Horizon Bank branches to increase his visibility and referrals; and (4) create an action plan[1] to increase his pipeline and sales. Snyder Decl. ¶ 18; Exh. D to Snyder Decl.

Mr. Sommerkamp did not appreciate Ms. Snyder's management style and believed that she sought results from him by placing him in fear for his job. He often emailed a co-worker at Horizon, James Kent, regarding his frustrations with Ms. Snyder. For example, in a May 25, 2022 email to Mr. Kent, Mr. Sommerkamp

---

[1] "Action plans" are forms that Ms. Snyder required her direct reports to complete on a quarterly basis to outline the steps they intend to take in order to achieve their performance goals. Snyder Decl. ¶ 20; Summerkamp Aff. ¶ 21. Ms. Snyder kept Mr. Summerkamp's action plans in his file and measured his performance against the preset goals. Summercamp Aff. ¶ 21. The action plans did not include any language outlining the consequences for failing to meet these goals and objectives. Snyder Dep. at 27.

wrote: "Folks should start calling me 'Calendar' b/c I definitely feel my days here are numbered."  Exh. 18 to Summerkamp Dep.  In that same email, Mr. Summerkamp, referencing Ms. Snyder, stated, "I have been non-stop threatened w termination & repeatedly asked if this is the right position for me."  *Id.*  That same day, Mr. Sommekamp emailed Mr. Kent about his plan to author a document about Ms. Snyder for his personnel file in order to "make[] immediate termination for insubordination trickier for H."  Exh. 19 to Summerkamp Dep. at 2.

Early in the week leading into the Memorial Day holiday in May 2022, Mr. Sommerkamp's physician diagnosed him with malignant skin cancer and informed him that he would need emergency surgery on a soon-to-be-determined date.  Sommerkamp Aff. ¶ 22.  After receiving this news, Mr. Sommerkamp notified Ms. Snyder by email that he would need to take the day off on Friday, May 27, 2022 for a "family emergency," as he did not feel ready to share the skin cancer diagnosis with anyone before he had an opportunity to process it.  *Id.*

According to Mr. Sommerkamp, on Tuesday, May 31, 2022, upon returning to work after the Memorial Day holiday, he called Ms. Snyder and told her that he had malignant skin cancer and needed emergency surgery.  He further informed Ms. Snyder that the surgery would be on or about June 20, 2022,[2] and asked

---

[2] Mr. Sommerkamp later learned that June 20, 2022 was a federal (and bank) holiday for the observance of Juneteenth.  Sommerkamp Aff. ¶ 26.

whether he should extend his current FMLA leave or apply for a second leave. Summerkamp Aff. ¶ 24, 25.  Ms. Snyder does not recall having this conversation with Mr. Sommerkamp.  Snyder Dep. at 28–29, 42.

On Wednesday, June 1, 2022, Ms. Snyder instructed Mr. Sommerkamp to enter a vacation day for his absence the previous Friday, which he did.  According to Mr. Sommerkamp, that same day, Ms. Snyder presented him with an action plan that he was required to, and did, sign and return to her.  Sommerkamp Aff. ¶ 31. The purpose of the action plan was to set Mr. Sommerkamp's work performance goals and improve his performance level.  *Id.* ¶ 33.  Ms. Snyder does not specifically recall this conversation about Mr. Sommerkamp's work performance. Snyder Dep. at 27–28.

According to Ms. Snyder, by June, Mr. Sommerkamp had not completed any of the four tasks that she had directed him to perform in May.  Snyder Decl. ¶ 22; Exh. D to Snyder Decl.  He had not documented any sales calls, sent letters to any attorneys, visited any other Horizon branches, or submitted his action plan.  Snyder Decl. ¶ 23; Exh. D to Snyder Decl.  Although Mr. Sommerkamp had worked for Horizon for nearly one year by that time, Ms. Snyder felt that he had failed to demonstrate that he was capable of performing his role successfully as he was not meeting his sales goals, not meeting with his clients, and was not performing any

of the items that Ms. Snyder specifically instructed him to perform.  Snyder Decl. ¶ 24; Snyder Dep. at 33.

On June 8, 2022, Ms. Snyder recommended Mr. Sommerkamp's termination, and, that same day, she and Kathi Tilling, Horizon's Human Resources Diversity & Inclusion Officer, called Mr. Sommerkamp to terminate his employment.  Snyder Decl. ¶¶ 28–29; Exh. D to Snyder Dep.; Exh. F to Snyder Dep.  On the call, Ms. Tilling informed Mr. Sommerkamp that he was being terminated for poor job performance.  Sommerkamp Dep. at 163-64.  Mr. Sommerkamp asked to resign in lieu of termination, and Ms. Tilling allowed him to do so.  Exh. F to Snyder Decl.  Accordingly, Mr. Sommerkamp resigned, effective immediately.  *Id.*

Nearly two weeks after Mr. Sommerkamp's employment ended, Horizon received FMLA documentation signed by Mr. Sommerkamp's dermatologist and dated June 21, 2022, thirteen days after  Mr. Sommerkamp had resigned in lieu of termination.  Sommerkamp Dep. at 175; Exh. 15 to Sommerkamp Dep.  In Part A of the documentation, Mr. Sommerkamp's physician noted that his "condition" commenced on June 20, 2022, when he underwent Mohs surgery.  Exh. 16 to Sommerkamp Dep. at 2.  The documentation also noted that Mr. Sommerkamp had been "treated for a melanoma in site on 6/20/22."  *Id.*

Given that Mr. Sommerkamp was no longer a Horizon employee and had not previously informed Human Resources that he would need to take time off work

13

for an upcoming surgery, no one at Horizon understood why his physician had submitted the documentation. Garwood Decl. ¶¶ 15, 18. According to Ms. Snyder, she also did not know that Mr. Sommerkamp had melanoma. Snyder Dep. at 29. Though Mr. Sommerkamp had emailed Ms. Snyder on June 1, 2022 about an outpatient "follow up surgery," he did not indicate that the surgery was related to a skin cancer diagnosis. Sommerkamp Dep. at 150; Exh. 15 to Sommerkamp Dep. In its entirety, the email read: "Want to hear a hoot—I have a follow up surgery in a few weeks—outpatient—and was putting in for time off & apparently that Monday is Juneteenth or whatever the new holiday is. The office is already closed!!" Exh. 15 to Sommerkamp Dep. Ms. Snyder denies discussing the surgery with Mr. Sommerkamp at any other point prior to his resignation. Snyder Decl. ¶ 32.

Mr. Sommerkamp filed this lawsuit on June 7, 2024, alleging that Horizon terminated him in retaliation for using FMLA leave. Now before the Court is Horizon's motion for summary judgment, which is fully briefed and ripe for ruling.

## **Legal Analysis**

### I.    **Summary Judgment Standard**

Summary judgment is appropriate where there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A court must grant a motion for summary judgment if it appears that no reasonable trier of fact could find in favor of the

14

nonmovant on the basis of the designated admissible evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). We neither weigh the evidence nor evaluate the credibility of witnesses, *id.* at 255, but view the facts and the reasonable inferences flowing from them in the light most favorable to the nonmovant. *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008).

## II.    Discussion

In his complaint, Mr. Sommerkamp alleged one count, labeled "FMLA Retaliation." Horizon moved for summary judgment on this claim, and, in his response in opposition to Horizon's motion for summary judgment, Mr. Sommerkamp now seeks to abandon that claim and proceed on a different legal theory, to wit, FMLA interference. Horizon contends that this is in essence an attempt to constructively amend the pleadings, which Mr. Sommerkamp should not be permitted to do at this late date. Mr. Sommerkamp rejoins that, because he has altered only his *legal* theory and not his *factual* theory, he should be allowed to abandon his FMLA retaliation theory and proceed on a FMLA interference theory.

Because "[t]he Federal Rules of Civil Procedure do not require a plaintiff to plead legal theories," *Vidimos, Inc. v. Laser Lab Ltd.*, 99 F.3d 217, 222 (7th Cir. 1996), "when a plaintiff does plead legal theories, it can later alter those theories." *Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 859 (7th Cir. 2017) (citing *id.* ("[T]here is no burden on the plaintiff to justify altering its original

15

theory."); *CMFG Life Ins. Co. v. RBS Securities, Inc.*, 799 F.3d 729, 743–44 (7th Cir. 2015) (holding that the plaintiff did not inappropriately add a new claim during summary judgment briefing when factual basis was alleged in the complaint); *Rabé v. United Air Lines, Inc.*, 636 F.3d 866, 872 (7th Cir. 2011) (noting that, after reversal of dismissal on pleadings, district court would have supplemental jurisdiction over claims not articulated, but implicit, in complaint)).  Thus, "[a]s a general rule, district courts should not hold plaintiffs to their earlier legal theories unless the changes unfairly harm the defendant or the case's development—for example, by making it 'more costly or difficult' to defend the case, or by causing unreasonable delay." *Chessie Logistics*, 867 F.3d at 859 (citing *Vidimos*, 99 F.3d at 222); *Whitaker v. Milwaukee Cnty.*, 772 F.3d 802, 808–09 (7th Cir. 2014) (finding that the plaintiff should have been permitted to proceed on a new summary judgment theory that merely recharacterized facts alleged in the pleadings and did not offer any "unfair surprise").

Here, the factual underpinnings of Mr. Sommerkamp's FMLA interference theory are the same as those underlying his prior FMLA retaliation theory, which facts were pled in Mr. Sommerkamp's complaint.  Accordingly, we cannot say that Horizon was subjected to any unfair surprise.  Additionally, in its reply, Horizon had the opportunity to fully address Mr. Sommerkamp's new FMLA interference theory.  Because Horizon has not shown that permitting Mr. Sommerkamp to alter

16

legal theories in response to summary judgment will unfairly prejudice it or cause any delay in resolving the case, Mr. Sommerkamp is permitted to abandon his FMLA retaliation theory and proceed on his FMLA interference theory.

To succeed on a claim for FMLA interference, Mr. Sommerkamp must establish that: "(1) he was eligible for the FMLA's protections, (2) his employer was covered by the FMLA, (3) he was entitled to leave under the FMLA, (4) he provided sufficient notice of his intent to take leave, and (5) his employer denied him FMLA benefits to which he was entitled." *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 635–36 (7th Cir. 2009). Here, even assuming that Mr. Sommerkamp can establish the first four prongs of the interference test,[3] he has failed to adduce evidence from which a reasonable jury could find that he was denied a benefit to which he was entitled by terminating his employment after he requested FMLA leave.

An employee is not entitled to "any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the plaintiff not taken the leave" or otherwise engaged in activity protected by the FMLA. 29 U.S.C. § 2614(a)(3)(B). Thus, "[t]he employer therefore may present evidence to show that the employee would not have been

---

[3] The evidence supporting Mr. Sommerkamp's contention that he provided sufficient notice of his intent to take FMLA leave for his surgery is conspicuously weak.

entitled to his position even if he had not taken leave; the employee then must overcome the employer's assertion." *Cracco*, 559 F.3d at 636 (citation omitted).  In other words, "an employee may be fired for poor performance when [he] would have been fired for such performance even absent [his] leave." *Kohls v. Beverly Enterprises Wis. Inc.*, 259 F.3d 799, 805 (7th Cir. 2001).  *See also Throneberry v. McGehee Desha Cnty. Hosp.*, 403 F.3d 972, 977 (8th Cir. 2005) ("[A]n employer who interferes with an employee's FMLA rights will not be liable if the employer can prove it would have made the same decision had the employee not exercised the employee's FMLA rights.").

Horizon has adduced significant evidence that Mr. Sommerkamp would have been terminated even absent any FMLA-related activity.  Mr. Sommerkamp does not deny the litany of discussions Ms. Snyder had with him regarding performance issues throughout his employment, both before and after engaging in FMLA-related activity.  The performance issues that led to Mr. Sommerkamp's February 25, 2022 written warning, which warning he received more than one month prior to ever requesting FMLA leave, are essentially the same performance issues that Ms. Snyder relied upon in recommending his termination in June 2022. Mr. Sommerkamp himself acknowledged in email communications the precariousness of his position with Horizon due to his poor performance, both prior to engaging in *any* FMLA-related activity (when he indicated that his future at

18

Horizon was "less than secure") and prior to his alleged conversation with Ms. Snyder about his skin cancer surgery (stating that his "days were numbered").

Though Mr. Sommerkamp did not receive any further formal warnings from Ms. Snyder after his April 2022 car accident, the undisputed evidence demonstrates that Ms. Snyder met with him on several occasions in April and May to discuss his performance, advising him that he needed to do four specific things immediately to improve his performance. By June, Mr. Sommerkamp had not completed any of the four tasks. He also does not dispute that by June 2022, he had generated less than $2,000 in revenue for the year, roughly $15,000 less than he should have generated by that time to meet his sales goal. Snyder Decl. ¶ 27.

In response, Mr. Sommerkamp argues that his performance issues stemmed from his minimal FMLA-related time off such that Horizon should have given him more time to improve, but the undisputed evidence does not support that conclusion. For nearly a full month prior to his resignation, Mr. Sommerkamp had been working a full-time schedule, and, in the month before that, he had been absent for fewer than two hours per week attending physical therapy. He was neither working nor being paid on a part-time basis nor had he indicated to Horizon that he was unable to perform at the level required due to his FMLA leave; thus, Horizon was entitled to expect him to perform at the level of a full-time employee. *See Pagel v. TIN Inc.*, 695 F.3d 622, 629 (7th Cir. 2012) ("The FMLA

does not require an employer to adjust its performance standards for the time an employee is actually on the job, but it can require that performance standards be adjusted to avoid penalizing an employee for being absent during FMLA-protected leave.").

In sum, given the overwhelming evidence of Mr. Sommerkamp's performance deficiencies, both before and after engaging in FMLA-related activity, no reasonable jury could find that Mr. Sommerkamp would have retained his job if he had not requested FMLA leave.  Accordingly, his interference claim fails, and Horizon is entitled to summary judgment.  *See Kohls*, 259 F.3d at 805 (7th Cir. 2001) ("An employer undoubtedly has the discretion to fire an at-will employee for … poor performance….").

## III.   Conclusion

For the reasons detailed above, Defendant's Motion for Summary Judgment [Dkt. 35] is <u>GRANTED</u>.  Final judgment shall be entered accordingly.

IT IS SO ORDERED.


Date:        3/31/2026                                    _Sarah Evans Barker_

                                                    SARAH EVANS BARKER, JUDGE
                                                    United States District Court
                                                    Southern District of Indiana

Distribution:

Clinton E. Blanck
BLANCK LEGAL, P.C.
cblanck@blancklegal.com

Haley Crum
Frost Brown Todd LLP
hcrum@fbtgibbons.com

Heather L. Wilson
FBT Gibbons LLP
hwilson@fbtgibbons.com